969 So.2d 56 (2007)
Kim Lashan GILLILAND, Appellant
v.
Roger Neal GILLILAND, Appellee.
No. 2005-CA-01568-COA.
Court of Appeals of Mississippi.
April 3, 2007.
Rehearing Denied August 21, 2007.
*60 William Matthew Thompson, Lee Ann Self Turner, Mark A. Chinn, Jackson, attorneys for appellant.
Richard C. Roberts, Jackson, David Bridges, attorneys for appellee.
Before MYERS, P.J., CHANDLER and ROBERTS, JJ.
CHANDLER, J., for the Court.
¶ 1. On July 22, 2005, the Chancery Court of Oktibbeha County entered a final judgment granting Kim Lashan Gilliland and Roger Neal Gilliland an irreconcilable differences divorce. The chancellor granted primary custody of the parties' two children to Roger. Kim appeals, arguing that (1) the chancellor should have disregarded the report of the guardian ad litem, (2) the chancellor manifestly erred in his consideration and application of the Albright factors in determining custody, and (3) the chancellor's visitation award was manifestly erroneous.

FACTS AND PROCEDURAL HISTORY
¶ 2. Roger and Kim were married on November 9, 1997. Two children were born of the marriage, Shawn Neal Gilliland, born on January 28, 1998, and Brandon Reed Gilliland, born on May 7, 2000. The Gilliland family lived in Starkville. Roger co-owned and managed his family's grocery store in the nearby town of Ackerman and Kim was employed as a nurse anesthetist at a local hospital.
¶ 3. On January 17, 2002, Kim filed a complaint for divorce on the ground of cruel and inhuman treatment or, alternatively, irreconcilable differences. Kim demanded possession of the marital home and its contents, temporary and permanent alimony, equitable distribution of the marital assets, and custody of the children. On the same day, Kim also requested temporary relief. However, Kim waited over six months before requesting a hearing on the motion. On August 26, 2003, the chancellor denied relief because of the passage of time and because the evidence before the court showed the parties had been living together harmoniously since the motion was filed.
¶ 4. Roger filed an answer to Kim's divorce complaint on August 22, 2003. On *61 April 29, 2004, Kim filed a second petition for temporary relief. On August 30, 2004, the court again denied temporary relief. On November 3, 2004, the chancellor entered an agreed order concerning temporary custody. The order provided that the children would remain in the marital home and that the parents would exercise custody of the children on an alternating weekly basis and in the absence of the non-custodial parent. The court appointed a guardian ad litem (GAL) on November 8, 2004, after a domestic disturbance that led to Kim's arrest.
¶ 5. The trial occurred on December 13-14, 2004 and on July 20, 2005. At the time of the trial, Shawn and Brandon were ages six and four, respectively. The trial testimony indicated that the children had been living in a volatile environment created by both parents' behavior.
¶ 6. Kim testified that the parties' relationship began to deteriorate shortly after Shawn was born. Kim stated that Roger often became angry and verbally abusive toward her in front of the children. Kim testified that when Roger became enraged, he would call her obscene and vile names. Kim stated that Roger had occasionally become physical during his rages. Kim related incidents in which Roger kicked her, grabbed her arms and threw her out of his truck, trapped her arms in the car window, threw her to the ground, and kicked in a door. Kim submitted photographs of bruises on her arms which she testified were caused by Roger. Kim testified that during some periods Roger had an angry outburst about every other day.
¶ 7. Kim placed audio recording devices throughout the house to capture Roger's outbursts. She testified that she had made "thousands" of hours of audio recording of Roger. Kim edited the recordings and made a CD recording of several incidents which was admitted into evidence. The Court has listened to the CD, which includes several wrathful tirades by Roger in the presence of the children in which Roger belittled Kim, cursed, used obscene terminology, threatened to hurt Kim, and, in one incident, yelled at Shawn.
¶ 8. Roger testified that conditions in the home had deteriorated since Kim filed for divorce in January 2002. Roger testified that Kim intentionally provoked him to anger in front of the children in an effort to create grounds for divorce. Roger testified that Kim would harass him by hiding his car keys, checkbook, or bills, running down his car battery, or upsetting the children. Roger testified that Kim had incited each of his outbursts on the CD. Roger admitted that he had lost control during those outbursts.
¶ 9. George Beals, Kim's licensed professional counselor, testified that Kim suffers from trichotillomania, a stress disorder in which the sufferer pulls out her hair. Beals stated that the condition is related to stress and is a mild coping strategy. Beals testified that Kim's trichotillomania had been exacerbated by stress-related anxiety from living with Roger. Kim testified that her hair pulling had gotten worse since Shawn was born, and that two years ago the hair pulling started to affect her appearance. Kim stated that she has bald spots but her hair pulling had improved since her separation from Roger.
¶ 10. There was testimony about Kim's temperament and discipline of the children. Roger's mother, Gola Mae Gilliland, testified that Kim was an extremely nervous person. Gola testified that she became nervous around Kim because Kim was so nervous and anxious. Gola stated that Kim had been in the military and wanted the boys to be "her little soldiers." Gola testified that Kim was extremely harsh and impatient with the boys and beat them when they needed discipline. *62 She stated that Kim would hold a child by the arm and "just whack them" with an open hand as hard as she could. Gola related that both Roger and Kim used spanking as discipline but that only Kim lost control when she spanked. Gola testified that, when Shawn was in nursery school, Kim tried to teach him first grade lessons. Gola testified that Kim "would push that three year old . . . to try to make it perfect, perfect, perfect. And she would scream at him, and she would shake him. . . . I saw her pinching him one time. . . . And he would just scream." Gola testified that the children were nervous and hyper and that she thought the children's behavioral problems had been caused by Kim's over-discipline.
¶ 11. Roger's father, Richard Gilliland, testified that Kim screamed at the boys when they would do something wrong. Richard and Gola both testified that they witnessed Kim hitting three-year-old Brandon excessively at Shawn's baseball game. Gola stated that, at the game, Kim ran around on the ballfield correcting Shawn. When Brandon picked up a bat and started running around, Kim "tore him up." Roger testified that he had fought with Kim about Kim's pinching of the children. Kim testified that she had learned from a parenting book to pinch a muscle at the base of a child's neck as a disciplinary measure.
¶ 12. The police were summoned on three occasions to the Gilliland home on domestic disturbance calls. Officer Demetric Armstead of the Starkville Police Department testified that both Roger and Kim were arrested on December 5, 2003. He stated that, when he arrived, both Roger and Kim had marks on them and the children appeared to be scared. In an incident on October 29, 2004, Kim called the police stating that Roger was beating her. Officer Laura Hines responded. When Officer Hines arrived, Roger was outside and had no shirt on. Officer Hines approached the front door and heard screaming inside the house. She called backup and another officer arrived. Roger let the officers into the house, where Officer Hines found Kim and the children in bed crying. Based upon Officer Hines's interview with the children, she took Kim into custody. Officer Hines stated that she observed two handprints on Shawn's leg and back.
¶ 13. Officer Hines stated that, when she placed Kim under arrest, Kim immediately fell to the floor. She was hysterical. When Officer Hines placed Kim in the patrol car, Kim repeatedly struck her head against the car window so hard that the window came off its track. Officer Hines stated that Kim's behavior was extreme. The officers placed Kim into the "rubber room" at the police station where she screamed and banged on the door.
¶ 14. Roger testified that the incident began when he checked on the boys, who were sleeping with Kim in Kim's bed. The boys awoke and went upstairs to sleep with Roger. Kim came upstairs and started "hitting on" Roger. Then Kim stood at the foot of the bed. According to Roger, Shawn tried to walk around Kim to leave the room, and Kim swung around and hit him and told him to get out of the room. Then, she hit him again and knocked him to the floor. Kim then attacked Roger by hitting him and pulling on his shirt. Brandon came into the room and jumped on Kim, trying to make her stop attacking Roger. Roger related that Kim was so furious that she turned around, grabbed Brandon, took him out in the hall, and threw him to the floor. Kim called the police and then resumed hitting Roger and pulling on his shirt. Roger went outside to call the police.
*63 ¶ 15. According to Kim, the incident began when Roger took the kids out of her bed. She stated that she went upstairs and told Roger it was sad that he had awakened the boys just so they could sleep with him. She testified that she told the boys to go downstairs. She said that Roger grabbed her by the arms and hit her in the face, prompting her to call the police. Kim said she repeatedly told the boys to get in bed but they would not, so she spanked Shawn on the bottom. Kim stated that she accidentally hit Shawn on the back because he was moving around. Kim stated that she became upset because the police arrested her instead of Roger.
¶ 16. Officer Natalie Smith of the Starkville Police Department testified that she took a statement from Roger and the children the day after the incident. She observed and photographed red marks on Shawn's back. Kim was charged with two counts of domestic abuse/simple assault and malicious mischief for the damage to the police car. Later that day, Officer Troy Outlaw was dispatched to a vehicle incident in which Kim had pulled her car in front of Roger's in order to stop Roger's car to gain access to Shawn. Roger testified that Kim had almost collided with another car when she pulled in front of him and that Kim dragged Shawn out of his car.
¶ 17. The GAL submitted her report on January 25, 2005, recommending that Roger be granted custody of the boys and for Kim to have visitation. The GAL filed a supplemental report on May 19, 2005. The supplemental report indicated that Kim had been found guilty in municipal court of two counts of simple assault/domestic violence resulting from her actions against Roger and Shawn.[1] The parties settled the issues of equitable distribution of the parties's property and attorneys' fees at the July 20, 2005 trial date, leaving the issues of custody, visitation, and child support for decision by the chancellor. After considering the Albright factors, the chancellor awarded primary custody of the children to Roger, with Kim to have visitation consisting of two weekends per month, alternating holidays, and four weeks in the summer. The court ordered Roger to attend anger management counseling. A final judgment of divorce was entered on July 22, 2005, from which Kim appealed.
¶ 18. During the pendency of this appeal, on October 21, 2005, the court denied Roger's petition to modify the final judgment and denied Kim's petition for modification of custody. See Halle v. Harper, 869 So.2d 439, 440(¶ 3) (Miss.Ct.App.2004) (if a proper basis for doing so is shown, a chancellor may modify child support, custody, and visitation while a case is on appeal). Later, Kim filed a complaint for modification of child custody and other relief, which was denied on July 27, 2006. In both the October 21, 2005 and July 27, 2006 judgments, the chancellor made minor modifications to the visitation schedule. Kim does not complain about these modifications on appeal.

STANDARD OF REVIEW
¶ 19. This Court adheres to a limited and well-settled standard of review in child custody cases. M.C.M.J. v. C.E.J., 715 So.2d 774, 776(¶ 10) (Miss.1998). For this Court to reverse, the chancellor's custody decision must have applied an incorrect legal standard or have been manifestly wrong or clearly erroneous. Id. "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, *64 was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996).

LAW AND ANALYSIS
I. THE CHANCELLOR WAS MANIFESTLY WRONG, CLEARLY ERRONEOUS, AND APPLIED AN ERRONEOUS LEGAL STANDARD IN CONSIDERING AN UNTIMELY AND FLAWED GUARDIAN AD LITEM'S REPORT.
¶ 20. Kim contends that she lacked an opportunity to challenge the GAL report, that she was deprived of an opportunity to confront all of the witnesses against her, and that the GAL was biased and incompetent. Kim contends that the chancellor should have disregarded the GAL report. We address each of Kim's arguments in turn and find that the chancellor did not err by relying upon the GAL report.
A. Lack of an opportunity to challenge the GAL report.
¶ 21. The GAL was appointed on November 8, 2004. The GAL attended the December 13-14 hearing and listened to the trial witnesses. She informed the court she would conduct the investigation and file her report filed by December 24, 2004. The chancellor invited the parties to submit briefs after the report was submitted. The GAL did not file her report until January 25, 2005. Relying on Lee v. Lee, 798 So.2d 1284 (Miss.2001), Kim argues that, because the GAL report was not filed until well after the hearing, she was deprived of an opportunity to challenge the report.
¶ 22. In Lee, the chancellor held a hearing and then entered a final judgment of divorce but reserved ruling on permanent custody. Id. at 1286-87(¶ 5). Later, the court set aside the divorce, appointed a GAL, and instructed the parties that a hearing would be held upon receipt of the GAL report. Id. at 1287(¶ 5). After receiving the GAL report, the chancellor entered a final judgment awarding the parties joint custody without ever holding the promised hearing. Id. at 1287(¶ 7). The supreme court found that, because the chancellor had reserved ruling on permanent custody and indicated an additional hearing would be held, the timing of the chancellor's appointment of a GAL was appropriate. Id. at 1292(¶ 34). However, because the promised hearing never occurred, the parties were deprived of their opportunity to challenge the GAL report and the chancellor impermissibly considered the GAL report. Id. at 1292(¶ 35).
¶ 23. In Lee, the parties were deprived of their opportunity to challenge the GAL report because the court appointed a GAL after the hearing and never held another hearing at which the parties could have challenged the GAL report. In this case, the GAL filed her report on January 25, 2005. The divorce hearing continued on July 20, 2005, after which the court entered a final judgment. The court expressly permitted the parties to submit briefs in response to the GAL report before July 20, 2005, and also permitted the parties to call witnesses at the July 20, 2005 hearing. Kim could have challenged the GAL report at the July 20, 2005 hearing and, therefore, she was not deprived of an opportunity to challenge the GAL report.
¶ 24. In her reply brief, Kim points out that in the chancellor's opinion the court stated: "Kim was convicted of simple assault/domestic violence. The court decided the issue of custody before her conviction. Therefore, whether the presumption against Kim's custody arose under Section 93-5-24 MCR is moot." Kim was convicted *65 on May 5, 2005. The chancellor issued no bench opinion or order affecting permanent custody until the final judgment was entered. Kim contends that, because the chancellor stated in his opinion that he had determined custody prior to her conviction, she was effectively deprived of an opportunity to introduce additional evidence pertinent to custody on July 20, 2005. Pursuant to Mississippi Rule of Civil Procedure 54(b), an order or other form of decision is subject to revision at any time before entry of a final judgment. The issue of permanent custody was not settled until the chancellor entered a final judgment on July 22, 2005. At the July 20, 2005 hearing, the chancellor told both parties that time was not a factor and to call any desired witnesses on the issue of custody. Thus, the chancellor was ready to consider additional evidence and Kim was not deprived of an opportunity to challenge the GAL report.
B. Deprivation of the opportunity to confront witnesses
¶ 25. The GAL stated in her report that, among other named witnesses, she had spoken with "neighbors of the Gillilands who have observed Mrs. Gilliland with the boys" and "neighbors of the Gillilands in Ackerman who have known Mr. Gilliland for years." Kim argues that the information provided by these unidentified neighbors was prejudicial to her and that the GAL's reliance on their information deprived her of her right to confront the witnesses against her.
¶ 26. Roger argues that Kim never raised this issue before the chancellor and thus did not preserve it for appeal. Indeed, at the July 20, 2005 hearing, Kim raised only one objection to the GAL report. Kim's counsel stated, "as to any factual issues set out in the guardian ad litem's report that were derived by the investigation of the guardian and not from the hearing, we would object to that as us not being allowed to confront the witnesses." The court overruled the objection because Kim had not subpoenaed any witnesses to testify at the hearing. Kim never objected to the unidentified witnesses in the GAL report and, therefore, this issue was not preserved for appeal. Educ. Placement Servs. v. Wilson, 487 So.2d 1316, 1320 (Miss.1986). "We are not required to address issues that are not objected to at trial and preserved for appeal." Dennis v. Dennis, 824 So.2d 604, 611(¶ 18) (Miss.2002).
C. The alleged bias and incompetence of the GAL
¶ 27. Kim complains that the GAL was biased in favor of Roger as evidenced by the GAL's statement in her report that she was "somewhat taken aback" by a remark by Kim. Kim also argues that the GAL was incompetent because the GAL conducted internet research on trichotillomania, and in her bill, the GAL erroneously referred to Kim as "Lisa" several times. Roger argues that these issues were not preserved for appellate review because they were not presented to the chancellor.
¶ 28. Kim maintains that these issues were raised by her "Reponse[Response] to Report of Guardian Ad Litem," which is included in the appellate record. But while the certificate of service of Kim's response is dated February 7, 2005, the file stamp indicates the response was not filed with the chancery court until November 21, 2005, well after the court's entry of final judgment on July 22, 2005. Because the record shows that Kim's response was not filed until after entry of final judgment, this Court cannot know that the response was before the chancellor for consideration prior to the entry of final judgment. Therefore, the record does not *66 show that the issues raised by Kim's response were preserved for appellate review.
II. THE CHANCELLOR COMMITTED MANIFEST ERROR IN HIS CONSIDERATION AND APPLICATION OF THE ALBRIGHT FACTORS IN HIS RULING ON CHILD CUSTODY.
¶ 29. In child custody cases, the polestar consideration is the best interests of the child. Hollon v. Hollon, 784 So.2d 943, 946(¶ 12) (Miss.2001). In arriving at a custody arrangement that is in the child's best interest, the chancellor must apply the factors from Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). These factors include: (1) the age, health and sex of the child; (2) a determination of which parent had the continuity of care prior to the separation; (3) which parent has the best parenting skills; (4) which parent has the willingness and capacity to provide primary child care; (5) the employment and employment responsibilities of each parent; (6) physical health, mental health, and age of the parents; (7) emotional ties of parent and child; (8) moral fitness of the parents; (9) the child's home, school, and community record; (10) the child's preference at an age sufficient to express a preference by law; (11) stability of the home environment; and (12) any other factors relevant to the parent-child relationship. Albright, 437 So.2d at 1005. On review of the chancellor's custody determination, we review the evidence presented at trial pertaining to each factor to ensure the chancellor's decision was supported by substantial evidence. Hollon, 784 So.2d at 947(¶ 13).
¶ 30. Kim argues that the chancellor erred by failing to award her custody of Shawn and Brandon and that the chancellor's application of the Albright factors demonstrates an abuse of discretion when compared with the evidence in the case. We review the evidence pertaining to each factor.
Age, health, and sex of the children
¶ 31. The chancellor found that both Shawn and Brandon were physically healthy but had emotional problems. After noting that, in the court's view, Kim had emotional problems and Roger had trouble controlling his temper, the chancellor found that this factor favored neither parent. Kim argues that the chancellor should have weighed this factor in her favor pursuant to the tender years doctrine.
¶ 32. The tender years doctrine is a presumption that "in all cases where any child is of such tender age as to require the mother's care for its physical welfare, it should be awarded to her custody, at least until it reaches that age and maturity where it can be equally well cared for by other persons." Law v. Page, 618 So.2d 96, 101 (Miss.1993). The tender years doctrine "is in no way absolute" and has been weakened such that it now functions as a presumption rather than as a rule. Id. While under Mississippi Code Annotated section 93-5-24(7), there is to be no presumption that the best interests of a child in general should favor the mother, the tender years presumption still has limited applicability to consideration of the "age of the child" factor under Albright. Passmore v. Passmore, 820 So.2d 747, 750(¶ 9) (Miss.Ct.App.2002) (citing Hollon, 784 So.2d at 947 n. 2). Thus, the tender years presumption is but one factor out of many in making the final determination of what arrangement serves the best interests of the child. Blevins v. Bardwell, 784 So.2d 166, 173(¶ 25) (Miss.2001).
¶ 33. "[A] child is no longer of tender years when that child can be equally *67 cared for by persons other than the mother." Mercier v. Mercier, 717 So.2d 304, 307 (Miss.1998). And, the tender years presumption may be considered less controlling in light of a child's male gender. Copeland v. Copeland, 904 So.2d 1066, 1075(¶ 35) (Miss.2004) (quoting Law, 618 So.2d at 101). In Copeland, the court indicated that a child over four years old may no longer be subject to the tender years idea. Copeland, 904 So.2d at 1075 (¶ 35). Shawn and Brandon were, respectively, ages seven and five at the time of the chancellor's decision. We find that, given the children's ages, the chancellor did not manifestly err in failing to apply the tender years presumption.
Continuity of care
¶ 34. The chancellor found that, while the parents had alternated weeks with the children since November 2004, Kim usually took the children to and from daycare. There was also evidence that Kim took the children to baseball practice and did their homework with them. The chancellor weighed this factor in Kim's favor.
Best parenting skills
¶ 35. The chancellor agreed with the GAL's opinion that neither party had better parenting skills than the other and weighed this factor equally between the parties. The chancellor noted that Shawn and Brandon were in counseling and that the need for counseling was recognized by both parents.
¶ 36. Kim argues that the chancellor should have weighed this factor in her favor. In support of this argument, Kim cites the evidence that Roger's attendance of the children's ball games was sporadic, that Kim was more involved with the children's school, and that neighbors testified that Kim spent time with the children outside and interacted well with them. Kim also points to her own testimony that she was the children's primary caregiver since birth and that she fed them, did homework with them, took them to church, and took them to ball practice. Kim contends that the chancellor ignored this evidence and unduly relied upon the GAL's report.
¶ 37. The record contains sufficient evidence of Roger's parenting skills such that the chancellor's decision that this factor weighed equally between Kim and Roger was not manifestly erroneous. Roger's parents testified that Roger takes the children fishing and on other outdoor activities. They testified that he was good with the children and that the children obeyed him. Gola testified that Roger was gentle with the children but an effective disciplinarian. Roger testified that, though Kim took the children to and from daycare, at home he and Kim divided the child care equally before their separation. Roger testified that he arranges his work schedule to spend time with the boys in the afternoons. The GAL observed that both parents had physically cared for the children that the children appeared to do better with Roger. The chancellor's decision that the parenting skills factor did not weigh in favor of either party was supported by substantial evidence.
Which parent has the willingness and capacity to provide primary child care
¶ 38. The court found that both parents had the willingness to care for Shawn and Brandon. However, the chancellor found that Roger had the better capacity to care for the children because Kim's emotional stability was questionable. In support of this finding, the chancellor pointed to the fact that Shawn had told the GAL that he was afraid of Kim and that, on the last occasion that the police came to his house, Kim had hit him twice and had thrown him and his brother out of the *68 room. The chancellor weighed this factor in favor of Roger.
¶ 39. Kim argues that this factor should have weighed in her favor. Kim argues that she is the parent most willing to care for the children because she has prioritized caring for the children and being actively involved in their education and activities. She further argues that, if she were compromised mentally or emotionally, she would have been unable to continue in her employment as a nurse anesthetist. Kim contends that the evidence showed that the source of her stress was Roger's emotional abuse of her which would be alleviated by the divorce judgment.
¶ 40. There was substantial evidence supporting the chancellor's finding that Roger had a better capacity to care for the children than did Kim due to Kim's mental and emotional condition. We review the evidence pertaining to Kim's mental and emotional condition below. Given that evidence, the chancellor did not manifestly err in finding that Kim's mental and emotional stability was questionable and in weighing this factor in favor of Roger.
Employment of the parent and responsibility of that employment
¶ 41. The chancellor found that this factor favored neither parent. The chancellor observed that Kim is a nurse anesthetist and is often on-call, but that others were able cover for Kim when her sons needed her. The court observed that Roger is self-employed, had reduced the number of hours he worked, and that his family and other employees could cover for him at work.
¶ 42. Citing Roger's testimony that he worked from 7:30 a.m. to 6:30 p.m., Kim argues that the chancellor's finding was manifestly erroneous. In so arguing, Kim ignores Roger's testimony that he reduced the number of hours he worked since separating from Kim. Roger testified that he co-owned the grocery store with his father, Richard Gilliland. Richard testified that Roger has complete flexibility with his schedule and typically works from 8:00 a.m. until 2:00 p.m., when he leaves to pick up the boys. Richard stated that Roger can leave anytime in case of emergency. There was evidence that Kim was on-call for weekends at a time but that she could have another employee cover for her or could bring the boys to the hospital with her. There was substantial evidence supporting the chancellor's finding that the parties were comparably situated regarding employment.
Physical and mental health and age of the parents
¶ 43. The chancellor found that Kim and Roger were both in good physical health, but that this factor favored Roger due to concerns about Kim's mental health. Kim argues that the chancellor's finding on this factor placed undue weight on the GAL report, which she contends was flawed. Primarily, Kim contends that the GAL mischaracterized her hair-pulling disorder as more serious than it was. Kim takes issue with the fact that the GAL conducted Internet research on trichotillomania and attached articles about it to her report.
¶ 44. Regarding trichotillomania, the GAL stated:
I researched this condition on the internet, knowing that there is both useful and useless information available. The articles I found related this condition to obsessive compulsive disorders or impulse control disorders. Rather tha[n] likening this disorder to nail biting these articles relate this disorder to kleptomania, pyromania, and other compulsive behaviors.
Kim argues that the chancellor should have deferred to Kim's counselor rather *69 than to the GAL regarding the seriousness of Kim's trichotillomania. Kim's licensed professional counselor testified that trichotillomania is a stress disorder and is a mild coping strategy akin to nail biting, overeating, or panic attacks. Kim contends that the chancellor erred by giving more deference to the opinion of the GAL formed after Internet research than to the opinion of Kim's licensed professional counselor.
¶ 45. The chancellor's opinion indicates that the chancellor's decision did not rest upon an opinion that trichotillomania was more like pyromania than like nail biting. Rather, it appears that the chancellor based his impression of Kim's mental health upon the totality of the evidence before the court. The chancellor stated:
Even though Kim has a demanding and responsible job, the court has serious concerns with regard to her mental health. As indicated in the guardian's report, Kim appears to be obsessive/compulsive and her past actions concern the court. To quote the guardian, "every time I have spoken with her in person or by phone there is no calm. When there is a problem, she calls several times and her messages sound frantic. There have been times when I have had to review her messages because they sound disjointed." This factor favors Roger and is the overriding consideration for the court's custody decision.
The court further stated, "In both the guardian's view and the court's view, Kim has serious emotional problems and these problems result in Kim over disciplining the children. The discipline nears physical and mental child abuse."
¶ 46. The chancellor's findings pertaining to Kim's mental health were supported by substantial evidence. It was undisputed that Kim suffered from stress-related anxiety and a stress disorder that prompts her to pull out her own hair. The testimony of Roger and his parents indicated that, when Kim became upset, she frequently lost control and that this loss of control was sometimes directed against the children. Gola testified that Kim used excessive force when spanking the children. Roger testified that Kim once became so frustrated about having to redo a room in the new house they were building that she picked up pieces of drywall and started hitting herself over the head with them. The GAL stated that she had interviewed the police officers who had arrested Kim for domestic violence/simple assault against Roger and Shawn in October 2004. They described Kim as being completely out of control. The officers who had been to the Gilliland home on prior occasions reported the same "bizarre behavior" and expressed concern for Kim's own safety and the children's safety. Shawn told the GAL that he was afraid of Kim due to her having hit him and thrown him and his brother. Shawn also related that he was frightened of Kim during the incident when Kim almost wrecked her car trying to stop Roger and then jerked Shawn out of the car.
¶ 47. The chancellor cited evidence throughout his opinion that supported his concern for Kim's mental health such as Kim's out-of-control behavior at her arrest. The chancellor also noted the GAL's conclusion from her visits to the home and her interviews with Shawn's teacher that Shawn was underperforming in school and that his underperformance was probably related to the stress caused by Kim. The teacher also said that Kim overemphasized Shawn's first-grade performance and that Kim called excessively to discuss Shawn's performance. Trial testimony indicated that Kim pressured the small children to perform well in school and that she made them do hours of studying on a daily basis. Shawn's teacher told the GAL that she was afraid to give Shawn a bad grade *70 because he cries because of what he anticipates from Kim. The chancellor also stated that Shawn's teacher told the GAL that once, when Kim visited her to discuss Shawn, Kim was constantly screaming threats at Brandon across the playground. The GAL stated that, during her visit in the home during Kim's custody, Kim appeared to be very nervous and that the level of anxiety surrounding her was oppressive.
¶ 48. Kim argues that the chancellor erred by finding she had mental health problems without ordering a medical evaluation. However, Kim's counselor testified she suffered from a stress disorder that caused her to pull out her hair. There was substantial evidence in the record that Kim suffered from stress and anxiety, and there were numerous instances in the record of Kim's behavior that, considered cumulatively, substantially supported the chancellor's concerns about her mental health. The chancellor did not manifestly err in weighing this factor in favor of Roger.
Emotional ties of parent and child
¶ 49. Finding that the children apparently love both Kim and Roger and that they loved the children, the chancellor weighed this factor equally between the parties. Kim does not challenge this finding on appeal.
Moral fitness of the parents
¶ 50. The chancellor found this was equally weighted. Kim argues that this factor should have been weighed in her favor because she took the children to church every Sunday and, until 2004, Roger did not attend church with the children. A chancellor may weigh this factor in a parent's favor if the parent contributed to a child's religious and spiritual development. Weigand v. Houghton, 730 So.2d 581, 587(¶ 23) (Miss.1999). However, in this case, the chancellor also had before him the evidence of Kim's arrest for domestic violence/simple assault on her husband and child. On this record, we cannot say that the chancellor manifestly erred in declining to find Kim more morally fit than Roger.
Home, school, and community record of the child
¶ 51. The chancellor found that Shawn was underachieving due to stress in the home. The chancellor stated that he believed the stress would be alleviated upon the grant of a divorce. The court found Brandon was performing satisfactorily in preschool. The court noted that Roger's family lived in Ackerman while Kim's family lived in Arkansas. Because Roger's family was in close proximity to him, the court weighed this factor in favor of Roger.
¶ 52. Kim argues that the chancellor's finding was improper pursuant to Watts v. Watts, 854 So.2d 11 (Miss.Ct.App.2003). In Watts, the chancellor weighed this factor in the husband's favor because he had an extended family in the area who would be supportive and because the wife had told the husband that she would move away from Mississippi with the children. Id. at 15(¶ 14). In the course of reversing the chancellor's award of custody to the husband, we found that the chancellor had erroneously weighed this factor in favor of the husband. Id. We found that the chancellor had placed too much weight upon the wife's statement that she would move away with the children. Id. We also stated that the wife should not have been penalized for her lack of a nearby extended family. Id.
¶ 53. In Neville v. Neville, 734 So.2d 352, 355(¶ 10) (Miss.Ct.App.1999), we held that the presence of an extended family structure contributes to the stability of a child's life and is a legitimate factor that can give weight to a custody determination. This holding was reaffirmed in Messer *71 v. Messer, 850 So.2d 161, 167(¶ 18) (Miss.Ct.App.2003). The Watts case does not demand our departure from this principle. There was substantial evidence supporting the chancellor's decision that the children's home, school, and community record favored Roger. The children had lived in Starkville all of their lives and their lives included frequent visits with Roger to their grandparents' home in Ackerman.
Stability of home environment of each parent
¶ 54. The chancellor found that the parents' employment favored neither party. The chancellor found that "the two young sons have been subjected to an unstable home as a result of their mother's obsessive/compulsive behavior and their father's anger." For that reason, the chancellor found that this factor did not favor either parent. Kim argues that this finding equated with an erroneous opinion that Kim had been diagnosed as suffering from obsessive/compulsive disorder. Kim argues that the stability of the home environment should have favored her because her job allows her to care for the children from the time school gets out and the location of her employment is closer to the home than Roger's.
¶ 55. It is indicative from the chancellor's opinion that his use of the term "obsessive/compulsive" was an attempt to describe the nature of Kim's behavior, not an opinion that Kim suffered from obsessive/compulsive disorder. Though perhaps the chancellor's use of another term would have been preferable, given the evidence of both parties' behavior in the home, the chancellor's weighing of this factor equally between the parties was not clearly erroneous.
Other factors relevant to the parent-child relationship
¶ 56. Under this heading, the court noted Kim's conviction of simple assault/domestic violence. The court declined to evaluate the application of the presumption against Kim's custody as the perpetrator of family violence prescribed by Mississippi Code Annotated section 93-5-24(9)(a)(i) (Rev. 2004). Neither party challenges the chancellor's decision under this factor.
Conclusion
¶ 57. The chancellor stated that Kim's mental health was the overriding consideration for the court's decision to award primary custody of both children to Roger. We find there was substantial evidence supporting the chancellor's decision. We observe that this Court does not sit to re-weigh the evidence that was before a chancellor and we must affirm if there was substantial evidence supporting the chancellor's decision. Bower v. Bower, 758 So.2d 405, 412(¶ 33) (Miss. 2000). There is evidence in the record reflecting negatively on both parents. The chancellor, "by his presence in the courtroom, was best equipped to listen to witnesses, observe their demeanor, and determine the credibility of those witnesses and what weight ought to be ascribed to the evidence given by those witnesses." Rogers v. Morin, 791 So.2d 815, 826(¶ 39) (Miss.2001) (quoting Carter v. Carter, 735 So.2d 1109, 1114(¶ 19) (Miss.Ct.App.1999)). As substantial evidence supported the chancellor's decision and the decision was not manifestly erroneous, the chancellor's custody determination is beyond our authority to disturb.
III. THE CHANCELLOR ERRED IN AWARDING EXTREMELY LIMITED VISITATION DESPITE HIS FINDING THAT THE CUSTODY ISSUE WAS A "CLOSE CALL."
¶ 58. The chancellor granted Kim visitation approximately consisting of four *72 weeks in the summer, two weekends per month, two Wednesday evenings per month, and alternating holidays. The four weeks' summer visitation was to be exercised with one week in June, two weeks in July, and one week in August. Kim argues that, because the chancellor expressed that the question of custody was close, the chancellor should have awarded a more liberal visitation schedule consisting of at least five weeks' summer visitation. Kim contends that the chancellor's award of four weeks' summer visitation effectively removes her from the children's lives as a regular presence.
¶ 59. Visitation is a matter within the chancellor's sound discretion. Mixon v. Mixon, 724 So.2d 956, 961(¶ 15) (Miss.Ct.App.1998). The chancellor is charged with fashioning a visitation schedule that is in the best interests of the children, and the chancellor's visitation decision is afforded great deference by this Court. Id. at 960(¶ 14). A minimum liberal visitation provision includes five weeks' summer visitation. Chalk v. Lentz, 744 So.2d 789, 792(¶ 9) (Miss.Ct.App.1999). However, the chancellor is vested with the discretion to determine whether the best interests of the children mandate liberal visitation or instead a more limited visitation provision. Horn v. Horn, 909 So.2d 1151, 1162(¶ 39) (Miss.Ct.App.2005) (citing Chalk, 744 So.2d 789 at 792(¶ 9)).
¶ 60. Kim argues that there was no legitimate reason for the chancellor to have awarded her limited visitation. However, the chancellor's opinion makes clear that he harbored serious concerns about Kim's treatment of the children when in her custody. The chancellor found that Kim's past treatment of Shawn and Brandon neared physical and mental child abuse and that her overzealousness had adversely affected the children. Given the evidence discussed above in our review of the custody determination, the chancellor acted within his discretion in finding that a more limited visitation schedule suited the best interests of the children.
¶ 61. THE JUDGMENT OF THE CHANCERY COURT OF OKTIBBEHA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] As shown by the parties' supplementation of the appellate record, on July 24, 2006, the Circuit Court of Oktibbeha County dismissed these charges as part of a plea agreement.