# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CP-00664-COA

**BENJAMIN SHANE FORTNER**                                    **APPELLANT**

**v.**

**PAMELA MAE (WEEKS) FORTNER**                                **APPELLEE**
**BRATCHER**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/22/2023 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD JR. |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | BENJAMIN SHANE FORTNER (PRO SE) |
| ATTORNEYS FOR APPELLEE: | JERRY WESLEY HISAW |
| | LEIGH ANN DARBY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 09/03/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Shane Fortner and Pamela (Pam) Bratcher were married and had one child. When they divorced in 2018, they agreed that Pam would have physical custody of the child and that Shane would have visitation. Since their divorce, both parties have filed petitions for contempt and to modify visitation or custody. Shane has also made numerous reports to the Department of Child Protection Services (CPS), none of which have resulted in a substantiated finding of abuse or neglect. In the present appeal, Shane argues that the chancellor abused his discretion or otherwise erred by (1) finding Shane in contempt, (2) declining to modify the parties' visitation schedule to give Shane more than four weeks of

summer visitation, and (3) ordering both parties to report any future allegations of abuse or neglect to local law enforcement before reporting the allegations to CPS. For the reasons discussed below, we find no error or abuse of discretion and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Shane and Pam married in January 2014 and have one child, R.F., born in 2011.[1]  The parties separated in September 2017, and Pam filed for divorce two months later.  In April 2018, they entered into a "Separation, Property Settlement and Child Custody/Support Agreement."  They agreed to joint legal custody, with Pam having physical custody and Shane having visitation.  Specifically, they agreed that Shane would have visitation "for a total of four weeks during the summer months" and "bear the expenses related to the exercise of his visitation rights, including all transportation expense."  In May 2018, the Panola County Chancery Court granted the parties an irreconcilable differences divorce and incorporated their Agreement into the final judgment.

¶3.     In June 2020, Pam filed a petition to modify visitation and for a citation of contempt.  She alleged that Shane's visitation "often result[ed] in allegations regarding Pam that involve [CPS] that [were] not substantiated" and "[c]ontroversies . . . in communication with the child."  Pam alleged that these issues adversely affected R.F., and she requested that Shane's visitation be supervised.  Shane answered and filed a counterclaim for a citation of contempt.  He alleged that Pam refused to permit meaningful visitation, made false allegations to CPS, "brainwashed" R.F., "effectively alienated [R.F.] from Shane," and harassed Shane by telling

---

[1] We use initials to protect the identity of the minor child.

2

R.F. to record Shane and requiring R.F. to activate GPS tracking on R.F.'s phone. Shane requested additional visitation and a court order that the parties "meet halfway . . . for visitation exchanges."

¶4. In December 2020, Pam filed a petition to appoint a guardian ad litem (GAL), noting that R.F. "was being counseled for emotional problems and trauma" but that Communicare, a mental health center, would no longer treat R.F. because of Shane's actions. She further alleged that Shane was causing R.F. distress by "telling him about or having him read legal documents." Pam argued a GAL was "needed to recommend custody and visitation for the minor child." The chancellor found that appointing a GAL was necessary "[b]ased upon the counter allegations of abuse made by the parties." The chancellor appointed Tina Scott as the GAL to represent the best interest of R.F., investigate allegations, ascertain facts, and make reports and recommendations as to the best interest of R.F.

¶5. In September 2021, the GAL filed an emergency motion for an order to prevent Shane from interfering with R.F.'s counseling sessions at Communicare[2] and from unilaterally taking R.F. to get a COVID vaccine over Pam's objections. The GAL's motion stated that Shane had "become increasingly . . . demanding and agitated in his communication with [the GAL]." In his pro se response,[3] Shane objected that he had not been "included [in R.F.'s] care at Communicare." Shane stated that he "simply wanted to be included and exercise [his]

---

[2] The GAL noted in her motion that after R.F. began counseling at Communicare, Shane requested a new therapist because he thought R.F.'s therapist was biased. As a result, Communicare suggested that the parties seek counseling for R.F. through another provider. Eventually, Communicare assigned R.F. a new therapist.

[3] Shane's attorney had withdrawn in November 2020.

rights as a parent," and he denied that he "wanted to . . . cause conflict in any way." Shane argued that R.F. should receive a COVID vaccine when it became available for his age group because Shane and his wife have autoimmune diseases.

¶6. Shane filed an emergency motion in October 2021, alleging that Pam was in a relationship with Edward Bratcher[4] and that Edward's "careless and immature behavior [was] a direct threat to [R.F.'s] physical and mental well-being." Shane requested that Edward not babysit R.F. without Pam present.

¶7. In November 2021, the GAL filed an emergency motion for an order/injunction without notice. The GAL alleged that she had attempted to notice a hearing on pending motions for December 13 but that Shane claimed the "date was too late" because R.F. was "scheduled for the COVID 19 vaccine on December 11th." The GAL sought to enjoin Shane from having R.F. vaccinated against Pam's wishes and to prohibit Shane from obtaining R.F.'s counseling records until the chancellor had ruled on those issues. The GAL also requested that Shane's visitation be suspended until after the hearing. On December 8, the chancellor entered an emergency order, enjoining Shane from having R.F. vaccinated, enjoining both Shane and Pam from interfering with R.F.'s counseling and obtaining R.F.'s counseling records, and denying Shane's request to restrict R.F.'s contact with Edward.

¶8. In January 2022, the case proceeded to trial on the pending petitions for contempt and modification of visitation. Post-trial, the chancellor[5] entered a final judgment finding "no

_____

[4] Pam and Edward later married. Shane has also remarried.

[5] Chancellor Vicki Daniels presided over the trial and entered the final judgment in January 2022. The case was reassigned to Chancellor Percy Lynchard Jr. in April 2022.

reason to restrict visitation by Shane"; however, she found that the parties' "visitation schedule was not working and in the best interest of the child." Regarding summer visitation, the chancellor ruled: "[Pam and Shane] shall alternate weeks beginning at 5:00 p.m. on Friday after school is out for one (1) week swapping each and every Friday. [Shane is] to have the first week." In addition, the chancellor found that Shane should continue to bear all "expenses related to the exercise of his visitation rights, including all transportation expense." Finally, the chancellor found that neither Shane nor Pam was in contempt.

¶9. In April 2022, Pam filed a new petition for contempt against Shane, alleging that Shane refused to return R.F. to Pam after his weekend visitation and that Shane "willfully refused to provide transportation" for R.F., requiring Pam to make a three-hour round trip to pick up R.F. The chancellor ordered Shane to return R.F. to Pam.[6]

¶10. In August 2022, Shane filed an emergency motion in which he claimed R.F. had made additional allegations against Edward and that Pam "willfully and contemptuously admitted [R.F.] to Parkwood Behavioral Facility . . . without a court order, informing the courts, or informing [Shane]." Shane stated R.F.'s admission to Parkwood prevented him from exercising his last scheduled week of summer visitation. According to Shane, Pam gave him two options to make up his visitation, neither of which was consistent with the court's visitation order. Shane stated that he asked to begin visitation with R.F. on the day R.F. left Parkwood, but Pam refused. Shane asked the court to grant him additional visitation for the

---

[6] The chancellor's temporary order also directed Edward not to have contact with R.F. The chancellor appointed Ginger Miller to serve as a GAL to investigate and ordered Shane to pay Miller's initial retainer fee. After Shane failed to pay Miller, the chancellor released Miller from her obligations and lifted all restrictions on Edward's contact with R.F.

week he had missed and find Pam in contempt.

¶11.    In March 2023, Shane filed another petition for contempt, alleging that Pam was attempting to alienate R.F. from Shane and Shane's mother. Shane further alleged that Pam had told Youth Villages[7] and R.F.'s school not to give Shane any information about R.F. He also alleged that Pam refused to bring R.F. to the designated meeting place for Shane's scheduled visitation.

¶12.    In April 2023, Pam filed an amended petition for contempt and modification. She alleged that Shane refused to return R.F. after his weekend visitation and refused to provide transportation for R.F. She also requested clarification of the parties' summer visitation schedule. Finally, she requested sole legal custody of R.F. based on an alleged material change in circumstances that adversely affected R.F.

¶13.    In response, Shane argued that he was only responsible for transportation *expenses* and that he was not solely responsible for picking up or dropping off R.F. Shane alleged that he had asked Pam for receipts for her transportation expenses but that Pam failed to provide any. Shane also alleged that Pam had refused to meet him halfway, and he argued that the parties should share responsibility for transportation because Pam had moved several times. Shane denied that he had refused to return R.F., asserting that he had "picked up and dropped off [R.F.] every weekend he was supposed to." Finally, Shane denied that R.F.'s summer visitation schedule required clarification, arguing that the schedule was already clear.

¶14.    In May 2023, the chancellor held a hearing on the pending petitions for contempt and

_____

[7] R.F. had been receiving counseling services from Youth Villages.

modification. During Pam's testimony, she read a portion of Chancellor Daniels's January 2022 bench ruling specifically telling Shane that she was "not going to change who is responsible for the transportation of the child back and forth."

¶15. Pam then testified that Shane exercised his visitation but did not return R.F. on six different occasions because "his car was unable to make the drive" or "he just wasn't going to do it." To support her testimony, Pam read text messages from Shane telling her that he would not be returning R.F. In one message, Shane said that he would no longer be returning R.F. to Pam because of Pam's "bad attitude." In his testimony, Shane admitted that he did not take R.F. back to Pam on multiple occasions, allegedly "[p]er orders of CPS and Baldwyn Police Department." Shane claimed that the "Baldwyn Police Department . . . made orders" that allowed him to keep R.F. pending further order from the chancellor.

¶16. Regarding the parties' summer visitation schedule, Pam testified that she interpreted the provision of the January 2022 judgment[8] to mean, "Go from the last day of school, count seven days, and then [Shane] gets [R.F.] that Friday." Pam asked the chancellor to clarify the provision to avoid future arguments.

¶17. Pam testified that she and Shane were unable to communicate or cooperate. She further explained that Shane had "bullied" her, R.F., Edward, her relatives, her attorney, and employees of Youth Villages.

¶18. Jameenah Campbell, a regional supervisor for Youth Villages, testified that Shane had

---

[8] As noted above, the judgment provided: "[Pam and Shane] shall alternate weeks beginning at 5:00 p.m. on Friday after school is out for one (1) week swapping each and every Friday. [Shane is] to have the first week."

requested R.F.'s counseling records from her. She explained to Shane that he would have to request the records through Youth Villages' corporate office. Campbell testified that her interactions with Shane had "been uncomfortable for [her], as well as [her] staff." She said, "[Shane] comes off as a bully, as if he's demanding what he wants . . . ." Campbell stated that Shane "had approached [another Youth Villages employee] in an aggressive manner [that] made her feel uncomfortable" and had photographed the employee's car and car tag. Shane also "left several voicemails on [Campbell's] voicemail at work, demanding things, and he . . . recorded the conversation when he was in [her] office." Lastly, Campbell testified that Shane was given the option to participate in R.F.'s counseling sessions, but Shane then stated that he would not take R.F. to the scheduled sessions.

¶19. Khalana Ollie, a care coordination supervisor for Youth Villages, testified that R.F. "ha[d] been doing well" in his counseling sessions. Ollie testified that Shane had been "aggressive" in making demands for records and that she and her colleagues had considered terminating R.F.'s counseling due to concerns about "the safety of [their] staff."

¶20. Pam testified that she "believe[d]" that Shane had also "bullied" "Panola County and Yalobusha County CPS workers." She testified Shane had made between ten and fifteen reports to CPS since 2017. Finally, Pam testified that she had incurred attorney's fees of $2,838 as a result of Shane's contempt and that the cost of picking up R.F. each time Shane failed to return the child was $78.39.[9]

¶21. The chancellor found that the prior judgments' transportation provision was "not

---

[9] This cost reflected her round trip at the "standard mileage rate" of $0.585 per mile.

ambiguous and require[d] [Shane] to pick up and return [R.F.]." Therefore, the chancellor found Shane in contempt due to his failure to return R.F. to Pam on six occasions. The chancellor ordered Shane to pay the attorney's fees Pam incurred as a result of his contempt ($2,838) plus the costs Pam incurred picking up R.F. ($470.34). The chancellor also ordered Shane to post a $1,000 bond for any future contempt-related expenses that Pam incurred.[10]

¶22. The chancellor denied Pam's request to modify their joint legal custody. However, the chancellor ruled that "[n]either party shall directly inform CPS of any allegations of neglect or abuse without first contacting and consulting with local law enforcement." Finally, the chancellor clarified the parties' summer visitation schedule, stating that Shane's visitation begins "at 5:00 P.M. on the first Friday **after** seven (7) days from the last day of school." Shane filed a notice of appeal.

## ANALYSIS

¶23. On appeal, Shane argues that the chancellor erred or abused his discretion by (1) finding him in contempt, (2) declining to modify the parties' visitation schedule to give him more than four weeks of summer visitation, and (3) ordering both parties to report any future allegations of abuse or neglect to law enforcement before reporting the allegations to CPS.

### I. Contempt

¶24. "Whether a party is in contempt is a question of fact to be decided on a case-by-case basis." *Savell v. Manning*, 325 So. 3d 1208, 1220 (¶43) (Miss. Ct. App. 2021) (quoting *Gilliland v. Gilliland*, 984 So. 2d 364, 370 (¶19) (Miss. Ct. App. 2008)). "A chancellor has

---

[10] The chancellor's order provided that the $1,000 would be returned to Shane if he was not found in contempt during the next year.

substantial discretion in deciding contempt matters because of the chancellor's temporal and visual proximity to the litigants." *Id.* (quoting *Gilliland*, 984 So. 2d at 369-70 (¶19)). "With respect to a finding of civil contempt, 'the factual findings of the chancellor are affirmed unless manifest error is present and apparent.'" *Id.* (quoting *Purvis v. Purvis*, 657 So. 2d 794, 797 (Miss. 1994)).

¶25. "'The primary purpose' of civil contempt 'is to enforce the rights of private party litigants or to enforce compliance with a court order.'" *Id.* at 1220 (¶41) (brackets omitted) (quoting *Purvis*, 657 So. 2d at 796). "The Mississippi Supreme Court has consistently held that the inquiry in a contempt proceeding is limited to whether or not the order was violated, whether or not it was possible to carry out the order of the court, and if it was possible, whether or not such violation was an intentional and willful refusal to abide by the order of the court." *Id.* at (¶42) (quoting *Ellis v. Ellis*, 840 So. 2d 806, 811 (¶18) (Miss. Ct. App. 2003)). "The failure of a party to comply with a divorce decree is prima facie evidence of contempt." *Weeks v. Weeks*, 29 So. 3d 80, 86 (¶23) (Miss. Ct. App. 2009). "A citation for contempt is proper when the contemner has willfully and deliberately ignored the order of the court." *Doyle v. Doyle*, 55 So. 3d 1097, 1111 (¶44) (Miss. Ct. App. 2010) (quotation marks omitted). "The only defenses to a contempt violation include an inability to comply with the court order or that the court order was unclear." *Savell*, 325 So. 3d at 1220 (¶42) (quotation marks omitted).

¶26. The parties' original agreement regarding custody and visitation, which the chancellor approved and incorporated into the May 2018 final judgment, provided: "[Shane] shall bear

10

the expenses related to the exercise of his visitation rights, including all transportation expense." Chancellor Daniels included the same provision in the modified judgment entered in January 2022. In addition, when Chancellor Daniels announced her ruling from the bench in January 2022, she specifically stated that Shane would continue to be "responsible for the transportation of [R.F.] back and forth."

¶27. At trial, Shane admitted that he had failed to return R.F. to Pam on multiple occasions. Pam testified that on one occasion, Shane said that he could not return R.F. because "his car was unable to make the drive." On other occasions, Shane simply refused to return R.F. He once said he would no longer return R.F. because Pam "had a bad attitude." Shane did not present any evidence of his inability to comply with the court order.

¶28. Nonetheless, Shane argues that he was not in contempt because the prior judgment made him responsible for only transportation *expenses*, not transportation per se. Shane argues that although the judgment required him to "bear . . . all transportation expense," he could still require Pam to transport R.F. to exchanges and then present Shane with "transportation receipts" for reimbursement. Shane further argues that he "asked for transportation receipts but [Pam would] never give him any information."

¶29. Chancellor Lynchard rejected Shane's argument, finding that the transportation provision was "not ambiguous and require[d] [Shane] to pick up and return the child." Accordingly, he found Shane in contempt for failing and refusing to do so. We cannot say that the chancellor erred by interpreting the court's prior judgments to require Shane to provide transportation to and from custody exchanges. The court's judgment stated nothing

11

about a reimbursement procedure or reimbursable expenses. Rather, the judgment clearly required *Shane* to "bear . . . all transportation expense." On these facts, we cannot say that the chancellor abused his discretion by finding Shane in contempt.

## II.    Visitation

¶30.    Shane argues the chancellor erred by not granting him visitation the first week R.F. gets out of school for the summer, which results in him having only four weeks of summer visitation. The chancellor's May 2023 order states that Pam and Shane "shall alternate weeks beginning at 5:00 P.M. on Friday **after school is out for one (1) week** swapping each and every Friday. [Shane is] to have the first week."[11] The order clarifies that Shane "is to start his summer visitation at 5:00 P.M. on the first Friday **after** seven (7) days from the last day of school that the child is required to attend."

¶31.    "Visitation is a matter within the chancellor's sound discretion." *Gilliland v. Gilliland*, 969 So. 2d 56, 72 (¶59) (Miss. Ct. App. 2007). "The chancellor is charged with fashioning a visitation schedule that is in the best interests of the children, and the chancellor's visitation decision is afforded great deference by this Court." *Id.* "To modify a visitation order, 'it must be shown that the prior decree for reasonable visitation is not working and that a modification is in the best interest of the child.'" *H.L.S. v. R.S.R.*, 949 So. 2d 794, 798 (¶9) (Miss. Ct. App. 2006) (quoting *Ellis*, 840 So. 2d at 812 (¶25)).

¶32.    This Court has stated, "Standard visitation includes two weekends a month until Sunday afternoon and at least five weeks of summer visitation, plus some holiday visitation.

---

[11] This provision first appeared in the January 2022 final judgment.

Awarding less is an abuse of discretion unless there is concrete proof of actual harm to a child." *Michael v. Smith*, 237 So. 3d 183, 190 (¶27) (Miss. Ct. App. 2018) (quotation marks, citations, and brackets omitted). However, we have also held that "our case law does 'not mandate a five-week summer visitation,' and a 'chancellor has discretion to fashion a visitation order to suit the child's best interest.'" *Smith v. Smith*, 379 So. 3d 954, 964 (¶31) (Miss. Ct. App. 2024) (quoting *Marshall v. Harris*, 981 So. 2d 345, 350 (¶23) (Miss. Ct. App. 2008)); *accord Horn v. Horn*, 909 So. 2d 1151, 1162 (¶39) (Miss. Ct. App. 2005) (stating that our caselaw does not "mandate five week summer visitation for non-custodial parents" but "recognizes the chancellor's discretion to determine whether [such visitation is in] the best interest of the child").

¶33.    Notably, the parties' own 2018 Agreement, which was incorporated into the original divorce decree, provided that Shane would have visitation "for a total of *four weeks* during the summer," which he could exercise in two non-consecutive two-week periods. (Emphasis added). The chancellor amended the parties' visitation schedule in January 2022, but nothing indicates she intended to grant Shane additional summer visitation. Rather, it appears that she simply changed Shane's summer visitation from two two-week periods to every other week. The successor chancellor then clarified any ambiguity regarding the meaning of this provision in his May 2023 order. The effect of the chancellors' January 2022 and May 2023 rulings is simply to carry forward the four weeks of summer visitation that *the parties themselves agreed upon at the time of their divorce*.

¶34.    In *Marshall*, we held that the chancellor did not abuse his discretion by awarding the

13

father summer visitation for the month of July. *Marshall*, 981 So. 2d at 350-51 (¶25). We reasoned that although the chancellor's award fell "short of . . . five weeks," the father had requested visitation for the month of July. *Id.* Likewise, in this case, we cannot say that the chancellor abused his discretion by carrying forward the four weeks of summer visitation that Shane himself agreed to in the parties' 2018 Agreement.

### III. Contacting CPS

¶35. Finally, Shane challenges a provision of the chancellor's order that states, "Neither party shall directly inform CPS of any allegations of neglect or abuse without first contacting and consulting with local law enforcement." Shane argues that this aspect of the chancellor's order conflicts with Mississippi Code Annotated section 43-21-353(1) (Rev. 2023), which provides that "any . . . person having reasonable cause to suspect that a child is a neglected child[ or] an abused child . . . shall cause an oral report to be made immediately by telephone or otherwise and followed as soon thereafter as possible by a report in writing to [CPS]."

¶36. Although the chancellor did not explain the reasoning for this provision, which applies equally to both parties, Pam argues that in the context of a child custody dispute, the chancellor has "the authority to manage the parties' interactions with child welfare agencies." Pam also argues that the chancellor's order will "discourage[] false reporting." Finally, she emphasizes that the chancellor did not prohibit the parties from contacting CPS but only required them to contact law enforcement first.

¶37. We agree with Pam that the chancellor's order can be read to avoid conflict with section 43-21-353(1) because it does not prohibit either party from reporting suspicions of

14

abuse or neglect to CPS—it only requires them to contact law enforcement first. In addition, in light of testimony that Shane had made numerous reports to CPS, none of which had resulted in a substantiated allegation of abuse or neglect, we can understand why the chancellor made such an order in this case. Unfounded allegations of abuse or neglect obviously can harm not only the subject of the allegations but also the child. Given the parties' history and the facts, we cannot say that the chancellor abused his discretion.

¶38. That said, such orders should be rare. Section 43-21-351(1) reflects a public policy that reasonable suspicions of child abuse or neglect should be immediately reported to CPS. Moreover, it is a crime to make a false report of child abuse or neglect to CPS, *see* Miss. Code Ann. § 97-35-47 (Rev. 2020), which should discourage false reports even without additional orders from the chancery court. Accordingly, while we find no abuse of discretion in this case, we expect such orders will be uncommon.

## CONCLUSION

¶39. The chancellor did not abuse his discretion by finding Shane in contempt, by declining to modify the parties' visitation schedule, or by ordering both parties to report allegations of child abuse or neglect to CPS only after first making a report to law enforcement.

¶40. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

15