618 So.2d 96 (1993)
Tylena Vonne LAW
v.
Perry Jack PAGE.
No. 91-CA-970.
Supreme Court of Mississippi.
April 22, 1993.
*97 John H. Ott, McComb, for appellant.
William B. Kirksey, Kirksey & Associates, Jackson, for appellee.
Before HAWKINS, C.J., and PITTMAN and BANKS, JJ.
PITTMAN, Justice, for the Court:
This is an appeal from the Chancery Court of Madison County, wherein Perry Jack Page was granted custody of Jason John Page, the minor child of Page and Tylena Vonne Law. This case began in June of 1989, when Page petitioned the lower court to adjudicate paternity and to change custody of Jason from Law to himself. A trial was conducted on November 6, 1989, wherein custody of Jason was granted to Page. On December 19, 1990, this Court reversed the chancellor's decision and remanded the case for further inquiry. See Law v. Page, 572 So.2d 880 (Miss. 1990). On remand, the case was heard June 4, 1991, in Madison County Chancery Court where Page was again granted custody of Jason. From that decision, Law has appealed to this Court for relief. Finding no abuse of discretion on the chancellor's part, we hereby affirm.

I.
Tylena Law (hereafter referred to as "Tena") and Perry Jack Page ("Jack") were never married, but sexual relations between them produced a son, Jason John Page ("Jason"), on September 10, 1988. A blood test indicated that Jack Page was 99.67% certain to be Jason's father. Jack then petitioned the court to establish paternity, and his name was then added to Jason's birth certificate as his legal father. Although Tena had custody of Jason, Jack voluntarily gave Tena $100 a month child support and included Jason on his employment medical insurance policy. Jack often paid Jason's medical expenses not covered by insurance. Upon establishing paternity, Jack petitioned the chancery court for custody of Jason, which was granted. On appeal to this Court, the decision was reversed and remanded for additional inquiry based upon the chancellor's consideration of Tena Law's behavior both three years prior to Jason's birth as well as her conduct following Jason's birth.
On remand, the chancellor heard evidence from sixteen witnesses. Five witnesses testified on Tena's behalf and eleven testified on behalf of Jack. Tena Law was called by Jack's counsel as an adverse witness. She was employed at Burns International Security as a security guard in the AT & T building, where she worked the graveyard shift. At that time, Tena rented a room in the household of Charles David Swanner, his wife and their two children. Unbeknownst to Tena, Mr. Swanner had been convicted of child sexual abuse in the state of New Jersey, and had recently ended a parole sentence in Mississippi. On visitation weekends, Tena and Jason would usually spend Friday night at Tena's mother's house and Saturday night at the Swanner's house, where Tena and Jason shared a full-sized bed. Since the initial trial, Tena had lived in a minimum of five different places. Prior to renting a room from the Swanners, Tena lived with Belinda Cox for a few months. Before that, she leased an apartment for a period of nine months, and at one time allowed a friend, Cheryl Wall, to live with her for the summer. Prior to the apartment, Tena lived with her parents, Dani and Ray Cox.
Following the chancellor's 1989 custody determination, Tena suffered a severe bout of depression and was checked into Charter Hospital where she was diagnosed as having a manic depressive disorder. Tena was prescribed, and still takes, the drug Vistaril which helps curb chemical imbalances.
As part of Jack's award of custody, Tena was required to pay $100 child support to Jack for the care of Jason, and to pay half of Jason's medical bills. Since that time, Tena became in arrears approximately $250 in child support and $89 in medical bills. Tena's child support payments were often sent in United States House of Representatives official letterhead as well as other governmental agencies such as the Internal *98 Revenue Service. Tena claims that she obtained these "extra" envelopes from the mail room where she worked, and used them because they were going to be discarded anyway. Tena attributes her loss of several jobs to all of the various charges that Jack has filed against her. Charges have been filed against Tena seven times for offenses such as trespassing, malicious mischief, and the use of violence against both Jack and his mother.
Cheryl Wall, Tena's friend and part-time roommate, testified that she had known Tena since they were teenagers. She and Tena began running around together again in late 1989, after Tena had lost custody of Jason. They would often go to nightclubs together. There were instances on weekends when Tena had visitation of Jason and she would drop Jason off at her mother's house so Tena could go out on the town. While Cheryl shared an apartment with Tena, she stated that Tena would spend half of the nights at her boyfriend Kent Durden's house. Cheryl stated that on one occasion Kent came over at 3:00 a.m. when Jason was there and stayed until six that morning before leaving. Apparently, there were instances where Jason and Tena spent the night at Kent's. Cheryl testified that Tena had smoked marijuana at their apartment in front of Jason, and took Valium while he was also there. She described Tena as having a violent streak, and on one occasion witnessed her beating her own head on the hood of the car, while Jason was in the front getting upset. Cheryl testified that she feared for Jason's safety, claiming that Tena is very unstable. Cheryl told of one instance in which she and Tena had been out drinking and stopped at Jack's then-girlfriend and now present wife Danya Lee Page's apartment at three in the morning with an intent to harass her. Tena instructed Cheryl to throw something at Danya's window in order to get her attention. A neighbor awoke and called the police. Cheryl and Tena were soon stopped and given breathalyzer tests for intoxication. Tena was taken to jail while Cheryl was allowed to go home.
Tena and Jack seemed to always have some sort of run-in when they came into contact with one another, usually when they met to drop off or pick up Jason. There was a violent Christmas Eve incident at Jack's house, there was an incident at the Jitney Jungle parking lot in Jackson. The parties agreed to meet in public places rather than at each other's home to try to avoid any more incidents. Because Jack expected trouble from Tena, he asked a friend of his and his friend's wife to observe the exchange of Jason. Kathleen Ingram testified that she and her husband were seated in their car and saw Jack pull up and park his Jeep in front of the store. A few minutes later they saw Tena drive up and park about fifty feet away. Tena walked Jason over to the truck, and after seeing who was in the passenger seat, gave Jason to Jack. Jack had asked his brother to ride in his Jeep so that he could witness the exchange. When Jack picked up Jason in his arms, Tena threw a tube of lotion at Jack's head, which he blocked. Tena then began swinging her arms at Jack, while Jason was still in his arms. Upon seeing this, Kathleen and her husband ran to break it up so that Jason would not be hurt, but a police car driven by another one of Jack's brothers arrived and sent the parties on their separate ways. Throughout this incident, Jason became scared and started crying.
JoAnn Parker, Danya Lee Page's mother, witnessed another incident on Mother's Day, 1991, where Tena dropped Jason off at Jack's home. Apparently when Jack picked up Jason and started walking inside, Tena grabbed him to prevent him from leaving. Jack, in turn, pushed himself free of Tena and closed the door to the sounds of Tena screaming "You saw him shove me ..."
Melissa Gardner testified to knowing the entire relationship between Tena and Jack. Melissa worked for Jack's previous attorney, Mark Fowler, and at the time of the hearing worked for Jack's current attorney, William Kirksey. Melissa has cared for Jason on several occasions and has acted as a neutral party in the exchange of Jason on visitation weekends. On one baby-sitting occasion, Melissa picked up Jason *99 from Tena and found him to be exhausted, smelling of urine and body odor, and in an overall filthy condition. While bathing him, she noticed a rash on Jason's bottom, which was so raw that Jason screamed when she put him in warm water. Melissa attributed this rash to Jason's sitting in wet "pull ups" [potty training pants] the entire day. While in the bathtub, Jason pointed to his forehead and said "Lisa can't hurt my bo-bo." He then said "fire truck" while still pointing to his head. Melissa explained that Jason called her Lisa, and that he was pointing to the area where he recently had thirty stitches. After Jason's bath he allegedly beat on the door and told Melissa and her husband Curtis to "Not let Kenny in" and to "Spank him [Kenny]."
While visiting Tena on another occasion, Jason had an accident that necessitated his being rushed to St. Dominic's Hospital where thirty stitches were used to sew up a gash above his left eye. The exact circumstances of the accident are not certain, but Jason indicated to several people that Tena's boyfriend, Kent Durden, hit Jason with one of his toys, namely a fire truck. According to Tena and Kent, Jason was running through the house and fell on a wooden step. Sunday night following the accident when Jason was given back to Jack, neither Kent nor Tena would say much about the accident. It was at that time that Kent claims to have been threatened by Jack. Jack is very skilled in the martial arts, achieving a fourth degree black belt in both Taekwondo and Hupkido.
Susan Schneeflock testified that she and her husband employ Jack as a draftsman in their business, Paramount Petroleum Company. She stated that Jack had worked for them off and on for about six years, but had worked for them full time the last three years. She described Jack as an excellent employee, whose only absences from work occurred when Jason was sick.
Since acquiring custody of Jason in November, 1989, Jack enrolled Jason in several day care schools. For the first six months, Jason was kept by a nanny who also kept two other children. Jason was then enrolled in Creative Arts Christian Academy for five months. Thereafter, Jason was enrolled in the Little Acorns Day Care Center in the McCoy Federal Building in downtown Jackson. Jack switched day care centers for two reasons. First, the employees of Creative Arts Christian Academy would let Tena come by for unannounced and unauthorized visits with Jason. Secondly, the day care was only a few minutes away from Jack's work, which allowed Jack more access to visit as well as closer to Jason in the event he had problems.
Katherine Rayburn, who runs Little Acorn Day Care, testified that Jason possesses above average verbal skills and perception for his age. In all other areas, Jason is average for children his age. Rayburn stated that Jason appears to have a normal, loving relationship with his father and his father's new wife, Danya Lee Page. Apparently Jack is attentive to Jason's needs, as he often sends a pair of shorts in event the weather warms, so that Jason will be comfortable when playing outside. Rayburn also stated that she can always tell when Jason is going to visit his mother because he is uncharacteristically aggressive on those Fridays prior to visitation. When Jason returns on Monday, he is always exhausted and still somewhat aggressive. It usually takes until Tuesday for Jason to resume his normal behavior.
Marivonne Frederick, Tena Law's grandmother, testified that although she had not seen Tena since she had testified against her at the 1989 trial, she had spoken with her on the telephone. It is still her grandmother's belief that Tena is not fit to have custody of Jason, and that Jack would provide a better home for him.
Charles Swanner, who rented Tena a room in his family's house, testified that Tena seemed to be a good mother, both with Jason as well as his two children. Swanner did admit that he was a convicted child sexual abuser and that he had just been released from parole. Swanner stated that there were occasions in which Jason had diaper rash, but that Tena picked him up that way. Of the few times that he had *100 seen Jason and Tena's boyfriend Kent Durden together, Swanner noted that Jason seemed to be fine.
Jack and his wife purchased a three bedroom house in Madison in February of 1991, in which Jason has his own bedroom. The house is on a cul-de-sac and is in a very safe area. There are several neighbors Jason's age with which he often plays. Jack opened up a savings account for Jason, so that he will learn the value of money. Jack and Danya are practicing Baptists and often read Jason Bible stories. Among Jason's favorite activities include going grocery shopping with Danya, going fishing with Jack, and going on picnics with Jack and Danya.
Jack estimated that eighty percent of the time Jason visits his mother, he comes back either sick or with severe diaper rash, both of which require medication to cure. By the time Jason gets well it is time for his next visit with Tena and the illness cycle continues. On visitation weekends when Jason is sick, Jack would send Jason's medication with instructions for Tena to follow. Tena would often ignore the instructions and in one instance gave Jason mixed medication that might have caused serious side affects if mixed with his present medication. Jack stopped sending the medicine bottles with Jason when Tena would not return the rest of the medication with Jason on Sunday evening. As a result, Jack started sending individually wrapped medication with instructions as to dosage written on masking tape and attached to the medication. On the one instance that Jason visited his mother with a rash, Jack testified that he gave Tena the ointment to continue applying it on Jason. It was this tube of lotion that Tena threw at Jack one Sunday when she returned Jason to Jack.
Subsequent to his June 5, 1991, testimony on behalf of Tena Law, Charles David Swanner, Sr. testified on August 19, 1991, that Tena had told him several times that hunting season was coming up and that she knew where Jack Page hunted and that she was going to have him killed. Tena told Swanner that she knew a couple of guys that would "knock him off." Tena also told him that she planned to get Jason and run off with him down to the Florida Keys, where she allegedly had friends who could find her a job. Apparently Law had considered running with Jason to the Northwest, the area in which she grew up and where her family resides, but decided against it because it would be an obvious place for the authorities to look. Swanner stated that Tena was very unstable, as well as a frequent user of pills, acid, cocaine and marijuana. On one occasion, Swanner witnessed Law smoking marijuana in the parking lot of her work, while still on duty as a security guard. Tena moved out of Swanner's home after she lost her job with Burns International Security.
LaNell Hughes, Tena's aunt, testified at this hearing concerning Tena's intentions of running off with Jason to Florida. Tena stated that her boyfriend, Kent, was going to help her with this act. LaNell also overheard a conversation at a local bar, in which Tena was discussing Jason's abduction with a man named Jimmy Slay. Slay was described as a man in his fifties, medium build, with gray hair. Around this time frame Tena was seen around the Little Acorns Day Care Center on three occasions trying to get Jason's attention. The employees of the day care center also noticed a gray-haired man in his fifties taking pictures of the children playing from a parking garage across the street from the day care center. Tena testified that she had not made any plans to run off to Florida with Jason nor ever discussed this plan with Jimmy Slay. In an attempt to discredit Swanner's claims, Tena accused Swanner of making sexual advances toward her in the presence of Swanner's wife. Tena claims that Swanner's intent was to get even with her after she refused his advances.
On appeal, Tena claims the following assignments of error:
I. DID THE CHANCELLOR FOLLOW THE ORDER OF THE SUPREME COURT DATED DECEMBER 19, 1990, WHEN HE TOOK THE CASE ON REMAND?
*101 II. WHETHER THE PROPER STANDARD OF LAW WAS APPLIED ON REMAND WHEN CONSIDERING THAT CUSTODY WAS TECHNICALLY AND LEGALLY WITH THE APPELLANT TYLENA VONNE LAW.
III. WHAT EFFECT THE TENDER YEARS DOCTRINE HAS UPON GRANTING CUSTODY OF JASON JOHN PAGE, AGE 2, TO MR. PAGE.
IV. WHETHER THIS CASE SHOULD BE REVERSED AND RENDERED WITH CUSTODY BEING GRANTED TO MRS. LAW.

II.
Under this Court's limited scope of review, findings of fact made by a chancellor will not be disturbed if this Court finds substantial evidence supporting these factual findings. Tedford v. Dempsey, 437 So.2d 410, 417 (Miss. 1983).
Tena argues that the appropriate standard of law to be applied in the present case is that used in child modification proceedings. This contention, however, is misplaced. The "material changes" standard used in modification proceedings is dependent on there being a prior determination of custody. Such is not the case here since there has been no prior custody determination. Therefore the proper standard of law to be applied is that found in divorce proceedings, which is the best interest of the minor child. See Albright v. Albright, 437 So.2d 1003, 1004 (Miss. 1983). In Smith v. Watson, 425 So.2d 1030 (Miss. 1983), this Court stated that in custody dealings involving an illegitimate child, when a father acknowledges the child as his own, the father is deemed on equal footing with the mother as to parental and custodial rights to that child. Id. at 1033.
Tena argues that the chancellor should have given the tender years doctrine more deference in determining custody of Jason. This doctrine first made its appearance in Mississippi in Johns v. Johns, 57 Miss. 530 (1879), wherein this Court stated that "[i]n all cases where any child is of such tender age as to require the mother's care for its physical welfare it should be awarded to her custody, at least until it reaches that age and maturity where it can be equally well cared for by other persons." This court has continuously held that if the mother of a child of tender years  especially a female  is so fit, then she should have custody. Buntyn v. Smallwood, 412 So.2d 236, 238 (Miss. 1982). Following the Buntyn reasoning the tender years doctrine seems less controlling, especially when considering Jason's male gender.
Although an important element in child custody determinations, the tender years doctrine is in no way absolute. Albright v. Albright, 437 So.2d 1003, 1004 (Miss. 1983). Over the years this doctrine has been slowly eroded to that of a presumption rather than a rule. Id. at 1005. In Cheek v. Ricker, 431 So.2d 1139 (Miss. 1983), this Court stated that "[i]t hardly seems rational that the age of the child should per se lead to any particular result." Id. at 1145. While this maternal preference has often been cited as an important factor in determining custody, the cardinal principle remains what is in the best interest and welfare of the minor child. Albright, 437 So.2d at 1004. In Albright, this Court stated:
We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of *102 the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
437 So.2d at 1005.
When the Albright factors are applied, it seems evident that Jason's best interests lie with his father's custody. Jason has remained in Jack's custody since the chancellor's November 1989, ruling. He was fourteen months old at that time and is now four and a half years of age. His health seems to be better when he is in Jack's custody and appears to receive proper medical attention. Jack's parenting skills seem to be good and were attested to by Kathy Rayburn, Jason's day care teacher. Jack has shown and continues to show a willingness to provide for Jason, both financially and emotionally. He apparently devotes ample time to meet Jason's daily health, medical and religious needs as well as providing a stable home for Jason to live. Both he and his wife have good jobs which allow them to fully provide for Jason's needs. Finally, Jason has established a good emotional bond with his father and step-mother.
An important consideration is the uprooting of a child from a suitable environment. After considering the evidence, it appears that the best interests of Jason lie with Jack. Jack has cared for Jason since he was fourteen months. Jason has enjoyed a stable family environment, proper nurturing and guidance which every child needs and deserves. To uproot him for a speculative lifestyle offered by Tena would certainly not be in Jason's best interests.
This Court is aware that a mother's bond with her child is often strong and highly sentimental, but we must ask whether Tena's actions are motivated by her own self interest as opposed to the welfare of Jason. The record reveals Tena to be of a vindictive nature and one can only question if her true intent is aimed at merely denying custody of Jason to Jack. Like so many unfortunate situations, Jason is merely a pawn caught in Tena's power play. No child deserves to be placed in this stressful situation.
Although this Court held that the chancellor previously erred in considering Tena's behavior three years prior to Jason's birth in his initial custody determination, Tena's behavior since Jason's birth has been less than model in trying to regain custody of Jason. Tena argues that the chancellor should not have considered her actions after the November 1989, award of custody to Jack because she was not the noncustodial parent. Her actions, however, are very important and highly relevant to this determination. Tena could have pursued different avenues rather than those of uncooperation, harassment, and vindictiveness because in the end, Jason is the one who is hurt. The testimony presented on Tena's behalf seems suspect, especially considering that most was from either family or close friends. Although the same could be said for the testimony presented by Jack, there was evidence presented by objective third parties, as well as testimony from some of Tena's own family members.
The chancellor's latest findings of fact and conclusions of law were very detailed, numbering thirty-four pages in length. Even after hearing evidence of Tena's alleged plan to run off with Jason the chancellor still felt that Tena was entitled to continued visitation. Tena is in no way being stripped of her parental rights, but is being limited in the way she can interact with her son. It is important that Jason maintain contact with his natural mother in the future, but this Court has not lost sight of Jason's need for a stable and nurturing environment.
The chancellor in this case was correct in granting custody of Jason to his father, Jack. When considering the evidence following Jason's birth it seems apparent that Jason's best interests lie in the custody of Jack. He and his wife have provided Jason a stable and nurturing environment in which to grow and seem more suitable to care for Jason than Tena. We therefore affirm the chancellor's determination.
AFFIRMED.
*103 HAWKINS, C.J., and DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.