MAXWELL, J.,
for the Court:
¶ 1. This child-custody dispute requires that we determine whether the chancellor applied the correct legal standard. M.T.F.[1] lived with his great-grandmother, Irene Daniels, for twelve years before his father, Marvin Fair, sought custody. The chancellor applied the Albright factors and found awarding custody to Fair was in M.T.F.’s best interest. M.T.F.’s mother, Theresa Reed, argues that because she had “de facto” custody, the chancellor should have applied a modification standard and only awarded custody to Fair upon finding a material change in circumstances adverse to M.T.F.
¶ 2. This court has held that where no prior custody determination has been made, the initial custody standard applies. Because (1) the chancellor appropriately applied the initial custody standard, and (2) the custody award is supported by substantial evidence, we affirm.
FACTS AND PROCEDURAL BACKGROUND
¶ 3. Fair and Reed had M.T.F. in 1997. Fair and Reed never married, and M.T.F. has spent virtually his entire life living with Daniels, who is Reed’s grandmother and M.T.F.’s great-grandmother. Fair has paid child support for M.T.F. since 1999.
¶ 4. In June 2009, Michael McIntosh, Jr. (Daniels’s grandson) allegedly molested M.T.F. and two of his male cousins.[2] McIntosh and the three boys lived in Daniels’s home, where the sexual abuse supposedly occurred. When Fair discovered *580 the molestation allegations, he filed a complaint in the Copiah County Chancery Court seeking legal and physical custody of M.T.F. At the time of the hearing, McIntosh had been indicted for the sexual misconduct but not convicted.
¶ 5. The chancellor held a hearing to determine whether Reed or Fair should be awarded custody.[3] He treated the case as an initial custody determination because there was no previous custody order. The chancellor applied the Albright factors and determined that it was in M.T.F.’s best interest for Fair to have legal and physical custody.
¶ 6. Reed now appeals, claiming: (1) the chancellor incorrectly applied an initial-custody-determination standard rather than a modification standard, and (2) the chancellor improperly applied the Albright factors.
STANDARD OF REVIEW
¶ 7. “Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record.” Henderson v. Henderson, 757 So.2d 285, 289 (¶ 19) (Miss.2000). We will not disturb a chancellor’s factual findings unless the chancellor’s decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard. Wallace v. Wallace, 12 So.3d 572, 575 (¶ 12) (Miss.Ct.App.2009). We do not substitute our “judgment for that of the chancellor, even if [we disagree] with the findings of fact and would arrive at a different conclusion.” Coggin v. Coggin, 887 So.2d 772, 774 (¶ 3) (Miss.Ct.App.2003). But when reviewing a chancellor’s interpretation and application of the law, our standard of review is de novo. Tucker v. Prisock, 791 So.2d 190, 192 (¶ 10) (Miss.2001).
I. Chancellor’s Refusal to Apply a Modification Standard
¶ 8. Reed primarily argues the chancellor applied the wrong legal standard in awarding custody of M.T.F. As Reed acknowledges, this court has directly answered the specific question before us on previous occasions. She urges us to overrule these cases.
¶ 9. Generally, in an initial custody proceeding, the parties are “deemed on equal footing,” and custody is awarded based on the best interest of the child under the Albright factors.[4] See Brown v. Crum, 30 So.3d 1254, 1258 (¶¶ 11, 13) (Miss.Ct.App.2010) (quoting Law v. Page, 618 So.2d 96, 101 (Miss.1993)). But there are situations where certain legal presumptions prevent the parties from having an equal claim to custody. For example, the father of a child born out of wedlock would not stand on equal footing with the mother where the father does not acknowledge the child as his own. Hemphill-Weathers v. Farrish, 779 So.2d 167, 172 (¶ 13) (Miss.Ct.App.2001) (Absent other factors, all jurisdictions recognize the mother of a child born out of wedlock, if a suitable person, possesses the primary right to the child’s custody.) (citing Smith v. Watson, 425 So.2d 1030, 1033 (Miss. 1983)). Here, because Fair has acknowledged M.T.F., he asserts a claim to custody equal to Reed. See Smith, 425 So.2d at 1033 (citing N. Hand, Jr., Mississippi Divorce, Alimony and Child Custody 271 (1981)) (“upon acknowledging the child as his own, the father has an equal claim ... *581 to the parental and custodial rights of the child”).
¶ 10. While chancellors must also consider the Albright factors in modification proceedings, “the movant carries a heavier burden[.]” Romans v. Fulgham, 939 So.2d 849, 852 (¶ 4) (Miss.Ct.App.2006). In a modification action, the party seeking custody must prove that since the original custody award, there has been a material change in circumstances adverse to the child, and a modification in custody would be in the child’s best interest. Tucker v. Tucker, 453 So.2d 1294, 1297 (Miss.1984).
¶ 11. In Law, our supreme court held: “The ‘material changes’ standard used in modification proceedings is dependent on there being a prior determination of custody.” 618 So.2d at 101. Relying on Law, this court has consistently held that where no previous custody determination has been made, the relevant standard is the child’s best interest under the Albright factors — not a “material change” modification standard. See Brown, 30 So.3d at 1258 (¶ 11); Williams v. Stockstill, 990 So.2d 774, 776 (¶7) (Miss.Ct.App.2008); Romans, 939 So.2d at 853 (¶7); C.W.L. v. R.A., 919 So.2d 267, 271 (¶ 10) (Miss.Ct. App.2005); S.B. v. LAW., 793 So.2d 656, 659 (¶¶ 13-14) (Miss.Ct.App.2001). We have also rejected the theory that a modification standard applies by virtue of one parent’s receipt of child-support payments. Brown, 30 So.3d at 1257-58 (¶¶ 10, 12-13); Romans, 939 So.2d at 852 (¶ 5).
¶ 12. Reed urges us to find a different legal standard applies because Fair waited longer to seek custody than the petitioners in our past decisions. But to distinguish this case based solely on the length of the delay would require that we establish a benchmark for determining when a “de facto” custody relationship exists, which to date we have refused to do. In Romans— which involved a delay of more than seven years — this court noted its reservations about distinguishing Law based on the timeliness of a parent’s request for custody because: (1) the resulting legal standard would likely be nebulous, and (2) no case law, including our supreme court’s precedent, supports hinging the applicable legal standard solely on the timeliness of the request for custody. See Romans, 939 So.2d at 853 (¶ 7).
 ¶ 13. Because we find this reasoning equally applicable today, we decline to create a rule that would make the applicable legal standard for awarding custody solely dependent on whether the length of the delay was, in our estimation, too long or too short. Instead, we follow the supreme court’s instruction in Law that where no previous custody determination has been made, the applicable standard is the child’s best interest under the Albright factors. Even if we were to accept the premise that a modification standard might apply in certain circumstances involving custody of children born out of wedlock, we believe this to be an inappropriate case to confront this issue because neither parent, but rather a third party, Daniels, had primary care of M.T.F. We further emphasize that our holding today in no way prevents chancellors from considering the length of a parent’s delay in asserting a claim for custody in determining the best interest of the child. See Brown, 30 So.3d at 1259 (¶ 16) (“Although delay in asserting custody may be a factor to be considered in determining the best interest of the child, it is not the controlling factor.”).
¶ 14. One of the concurrences deems Reed the de facto custodian of M.T.F. even though M.T.F. has been primarily under his great-grandmother’s (Daniels’s) care the vast majority of his life. We disagree with this conclusion.
*582 ¶ 15. It is uncontradicted that M.T.F. lived primarily in Daniels’s home from the time he was born until approximately two months before the custody hearing. Daniels testified M.T.F. has spent most of his life in her home, and Reed often visited, albeit sporadically. But according to M.T.F.’s aunt, whose son had often stayed in Daniels’s home, M.T.F. was present every time she visited the home, yet Reed never was. Daniels claimed she had not charged either parent “one nickel” to clothe, feed, and provide shelter for M.T.F. Though Daniels “encouraged” Reed to spend her child-support money on M.T.F., Daniels indicated that she bore the cost for providing M.T.F.’s basic needs. Given these circumstances, the chancellor did not regard Reed’s contribution to M.T.F.’s care as significant, and certainly did not find Reed to be M.T.F.’s de facto custodian.
¶ 16. We find this sort of fact-based disagreement highlights the difficulty in defining “de-facto custody,” which would be created were we to alter course today.
¶ 17. Based on the facts before us, we find the chancellor applied the correct legal standard.
II. Chancellor’s Albright Analysis
¶ 18. In child-custody cases, the “polestar consideration” is always “the best interest and welfare of the child.” Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). The Albright factors are a guide for chancellors in weighing the facts to determine the child’s best interest. An Albright analysis is not, by any means, a mathematical equation. Lee v. Lee, 798 So.2d 1284, 1288 (¶ 15) (Miss.2001). And the factors are not meant to be weighed equally in every case. Divers v. Divers, 856 So.2d 370, 376 (¶27) (Miss.Ct.App.2003). In some cases, one or two factors may weigh more heavily and control the custody determination. Id. The supreme court has held that “[a]ll the [Albright] factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit.” Johnson v. Gray, 859 So.2d 1006, 1013-14 (¶ 36) (Miss.2003).
¶ 19. The Albright factors include: (1) the child’s age, health, and sex; (2) which parent had the continuity of care before the separation; (3) which parent has the best parenting skills; (4) which parent has the willingness and capacity to provide primary child care; (5) each parent’s employment and its responsibilities; (6) each parent’s physical and mental health and age; (7) the emotional ties between the child and each parent; (8) each parent’s moral fitness; (9) the child’s home, school, and community record; (10) the child’s preference, if the child is over twelve years old; (11) the stability of the home environment; and (12) any other relevant equitable factor. Albright, 437 So.2d at 1005; Daniel v. Daniel, 770 So.2d 562, 564 (¶ 6) (Miss.Ct.App.2000) (citing Albright, 437 So.2d at 1005).
¶20. Here, the chancellor made findings of fact and conclusions of law on each Albright factor. The chancellor held that under the totality of the circumstances, legal and physical custody should be awarded to Fair. The chancellor found that no factor favored Reed, while multiple factors favored Fair. The chancellor made the following findings:

A. Age of the Child

¶ 21. The chancellor determined it is preferable for a child M.T.F.’s age, then twelve years old, to be awarded to the parent of the same gender.

B. Sex of the Child

¶22. The chancellor found this factor favored Fair because there is no male father figure in Reed’s home.

*583
C.Health of the Child

¶ 28. The chancellor noted M.T.F. had likely been a sexual-abuse victim. While Reed allowed M.T.F. to determine his own need for counseling, the chancellor found important that Fair had already sought the services of a child psychologist and was prepared to pay any out-of-pocket expenses for M.T.F.’s counseling. The chancellor also found Reed has not adequately provided for M.T.F.’s vision and dental care.

D.Moral Fitness

¶ 24. Reed has a total of four children born out of wedlock and admitted she might be pregnant with her fifth out-of-wedlock child. She voluntarily relinquished custody of M.T.F.’s sister to Fair’s aunt. And she admitted being involved in violent incidents in the past, including a knife fight. The chancellor determined this factor favored Fair.

E.Willingness and Capacity to Provide Primary Care

¶25. The chancellor found this factor favored Fair because he lives in a condominium where M.T.F. can have his own room, while Reed lives in a two-bedroom apartment with “lots of other people.”

F.Catch All

¶26. The chancellor found significant that Reed allowed a third party, Daniels, to care for her child. He reasoned that although Daniels had no ill intentions, three of her great-grandchildren, including M.T.F., were sexually abused by McIntosh in her home. The chancellor emphasized that Reed and Daniels do not want McIntosh to be incarcerated or otherwise punished, but instead favor mental treatment.

G.Remaining Factors

¶ 27. Because M.T.F.’s primary caretaker was Daniels, the chancellor found the continuing-care factor to favor neither parent. For this same reason, the chancellor found Reed’s employment responsibilities did not weigh in her favor. Though Reed worked only part time, the chancellor determined her time off was no benefit because Daniels cares for the children. The chancellor also weighed the remaining issues neutrally mainly due to lack of evidence on these factors.
¶28. Reed makes multiple challenges to the chancellor’s Albright findings. First, she argues that the chancellor failed to give adequate weight to Fair’s twelve-year delay in seeking custody.
¶ 29. We have held: “Although delay in asserting custody may be a factor to be considered in determining the best interest of the child, it is not the controlling factor.” Brown, 30 So.3d at 1259 (¶ 16). We find the chancellor addressed the important considerations under the continuity-of-care factor. And he observed that Daniels (a third party) had been M.T.F.’s primary caregiver throughout his life. Daniels also provided for M.T.F.’s basic needs, including food, clothing, and a place to live. Further, Reed, like Fair, did not seek custody of M.T.F. during the same twelve-year period but allowed M.T.F. to remain in Daniels’s home under Daniels’s primary care.
¶ 30. Second, Reed argues the chancellor ignored the fact that Fair did not seek custody of his female biological child. Fair disputes he is this child’s biological father, and no testing has been performed to establish his paternity. Even assuming Fair is this child’s father, this fact does not affect our analysis since Reed has never been the primary caretaker of this child. Because Reed voluntarily relinquished custody of the female child to Fair’s aunt, we find it illogical to weigh Fair’s failure to seek custody of the female child in Reed’s favor.
*584 ¶ 31. We acknowledge the “strong preference ... for keeping siblings together unless unusual circumstances justify their separation.” Deborah H. Bell, Mississippi Family Law § 5.03[12][a] (2005) (citing Sellers v. Sellers, 638 So.2d 481, 484 (Miss.1994)). But by no means is there a per se requirement that siblings not be separated. Sparkman v. Sparkman, 441 So.2d 1361, 1362 (Miss.1983); C.A.M.F. v. J.B.M., 972 So.2d 656, 661 (¶¶ 21-22) (Miss.Ct.App.2007). In addition to the uncertainty of paternity of the female child, the presumption here would not apply given the unusual circumstances that the siblings have spent the majority of their lives residing with different third parties. It is unclear from the record if they have ever lived together.
¶32. Third, Reed asserts that Fair’s testimony provided the only evidence of M.T.F.’s dental and vision problems. While this may be true, we note Reed elected not to cross-examine Fair on these issues. Nor did she present any contrary evidence. Reed also contends that Fair provided the only evidence of M.T.F.’s sexual abuse, which is simply incorrect. We find in the record where Reed stated that she talked to her son about the abuse. Though her testimony is vague as to the substance of their conversations, she acknowledged that she had made no attempt to secure counseling for M.T.F. after hearing the allegations. She also clearly conveyed her belief that McIntosh deserved treatment rather than jail time for his actions.
¶ 33. We recognize that McIntosh had not been convicted of the molestations at the time of the hearing. But our task is not to consider the weight of the evidence against McIntosh but rather to decide whether the chancellor abused his discretion in determining M.T.F.’s best interest. When the chancellor contemplated this polestar consideration, charges were pending against McIntosh, and Daniels did not seek custody of the children. Therefore, the chancellor focused on determining which parent would be the more capable to provide M.T.F. psychological treatment. It is obvious this issue favored Fair, as the chancellor found. The chancellor also highlighted that Reed favored treatment over incarceration for McIntosh. We find no abuse of discretion in the chancellor’s analysis of these issues.
¶ 34. Finally, Reed argues the chancellor overlooked Fair’s testimony that M.T.F. had performed well in school. In addressing the stability of the home environment, the chancellor held that “there are no issues regarding this factor.” Though the chancellor did not elaborate, this factor apparently favors neither parent because Daniels — not Reed or Fair— provided the home environment in which M.T.F. performed well in school. Thus, we find the chancellor acted within his discretion in deciding this factor did not affect the custody award.
¶ 35. On balance, and considering the totality of the circumstances surrounding the chancellor’s analysis of M.T.F.’s best interest, we are unable to conclude the chancellor manifestly erred in awarding custody to Fail'.
CONCLUSION
¶ 36. The chancellor properly applied the Albright factors rather than the custody-modification standard because no prior custody determination had been made. And the chancellor did not abuse his discretion in weighing the Albright factors. Therefore, the chancellor’s judgment is affirmed.
¶ 37. THE JUDGMENT OF THE CO-PIAH COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS *585 APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE AND MYERS, P.JJ., IRVING, BARNES, ISHEE AND ROBERTS, JJ„ CONCUR. GRIFFIS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J. CARLTON, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION.

. Since this case involves allegations of sexual abuse, we have substituted initials in place of the minor's name.

. All three boys are Daniels's great-grandchildren.

. Daniels has made no claim for custody in this matter.

. For a list of the Albright factors, see Issue II of this opinion.